**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

ROBERT TEEL,

              Plaintiff,

v.

                                    Case No. 18-CV-323-GKF-JFJ

UNITED STATES OF AMERICA,

              Defendant.

## OPINION AND ORDER

Before the court is the Motion to Exclude Certain Testimony of Plaintiff's Expert [Doc. 42] and Motion for Summary Judgment [Doc. 43] of defendant United States of America. For the reasons set forth below, the motions are denied.

## I.    Background

This case arises from the alleged negligence of medical professionals at Claremore Indian Hospital ("CIH"), a government owned and operated healthcare facility. Mr. Teel, a citizen of the Cherokee Nation, has received medical care at the CIH for most of his life. [Doc. 44, p. 5 ¶ 1; Doc. 49, p. 4 ¶ 1]. Mr. Teel was diagnosed with prostate cancer in October 2016. [Doc. 44, p. 10, ¶ 16; Doc. 49, p. 8, ¶ 16]. He alleges that CIH providers delayed and exacerbated his cancer by failing to timely refer him to a urologist and administering testosterone injections. "The testosterone treatment accelerated the growth of the cancer, making conservative treatment improbable. Earlier diagnosis and treatment . . . would more likely than not have delayed and/or obviated the need for surgery." [Complaint, Doc. 2, p. 2, ¶ 6]. Mr. Teel brings this action for medical negligence pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80. [Complaint, Doc. 2, p. 1, ¶ 2].

Defendant United States of America moves for summary judgment. [Doc. 43]. Defendant argues "[t]he undisputed facts of this case, taken in a light most favorable to Mr. Teel, establishes that Defendant's care did not cause him any damages." [Doc. 43, p. 1]. Put another way, defendant contends "Mr. Teel provides nothing beyond sheer speculation that his outcome would have been any different if the care provided by CIH had been different." [Doc. 50, p. 1]. Defendant also moves to exclude portions of testimony by Mr. Teel's expert, Dr. Marc Steven Milsten. [Doc. 42]. Defendant argues Dr. Milsten's opinions on (1) the relationship between testosterone and the growth of prostate cancer and (2) whether the care provided by CIH caused Mr. Teel's alleged damages "are not reliable and/or based on speculation." [Doc. 42, p. 1].

## II.    Relevant Facts

The facts in this matter are largely undisputed. Doctors use prostate specific antigen ("PSA") blood tests to screen patients for the risk of prostate cancer. [Doc. 44, p. 5, ¶ 3; Doc. 49, p. 5, ¶ 3]. When used correctly, PSA tests are considered reliable and valuable in the field of urology. [*Id.*]. However, PSA tests alone do not indicate whether a man has prostate cancer or not. [Doc. 44, p. 6, ¶ 3; Doc. 49, p. 5, ¶ 3]. CIH providers tested Mr. Teel's PSA level on at least four occasions:

1.  Mr. Teel's PSA levels were first tested at the CIH Walk-In Clinic on March 6, 2012. [Doc. 44, p. 6, ¶ 4; Doc. 49, p. 5 ¶ 4]. His PSA on that day was **4.78**, which was considered high. [Doc. 44, p. 6, ¶ 5; Doc. 49, p. 5, ¶ 5]. However, the PSA may not have been reliable because Mr. Teel had acute prostatitis at the time of the test. [Doc. 44, p. 6 ¶¶ 4-5; Doc. 49, p. 5, ¶¶ 4-5].

2.  On August 25, 2014, Mr. Teel returned to the CIH with complaints of pain and swelling from an arm tattoo. [Doc. 44, pp. 6-7, ¶ 6; Doc. 49, p. 5, ¶ 6]. His PSA on that day was **4.00**, which was considered at the high end of normal. [*Id.*]. At a follow-up visit on August 28, 2014, another PSA was ordered. [Doc. 44, p. 7, ¶ 7; Doc. 49, p. 5, ¶ 7]. However, no follow-up PSA was performed. [*Id.*].

3. Mr. Teel went to the CIH again on March 7, 2016 because of low energy and libido, as well as a lump on his right elbow. [Doc. 44, p. 7, ¶ 8; Doc. 49, p. 6, ¶ 8]. Blood work performed showed Mr. Teel's testosterone levels were low. [*Id.*]. At a follow-up visit on March 21, 2016, Mr. Teel began testosterone replacement therapy. [Doc. 44, p. 8, ¶ 9; Doc. 49, pp. 6-7, ¶ 9]. That day, his PSA level was elevated to **7.17**. [*Id.*]. On April 11, 2016, Mr. Teel's testosterone dose was increased and, because of his elevated PSA score, he was referred to a urologist. [Doc. 44, p. 8, ¶¶ 10-11; Doc. 49, p. 7, ¶¶ 10-11].

4. On August 17, 2016, Mr. Teel returned to the CIH for follow-up for his elevated PSA. [Doc. 44, p. 10, ¶15; Doc. 49, p. 7, ¶ 15]. Mr. Teel's PSA was elevated to **12.88** on that day. [*Id.*]. Mr. Teel was again referred to a urologist. [*Id.*].

Mr. Teel ultimately received care for his elevated PSA from the Urologic Specialists of Oklahoma ("USO"). [Doc. 44, p. 10, ¶ 16; Doc. 49, p. 8, ¶ 16]. On October 6, 2016, Dr. Andrew Wright performed a biopsy and diagnosed Mr. Teel with prostate cancer. [*Id.*]. Dr. Wright determined Mr. Teel's prostate cancer was moderately aggressive with a Gleason Score of 7.[1] [*Id.*]. Mr. Teel continued to receive testosterone replacement therapy until providers at CIH were advised of Mr. Teel's prostate cancer diagnosis on October 17, 2016. [Doc. 44, p. 8, ¶ 9; Doc. 49, pp. 6-7, ¶ 9].

Mr. Teel met with Dr. Marc Milsten at USO for a prostate cancer treatment consultation on October 26, 2016. [Doc. 44, p. 11, ¶ 17; Doc. 49, p. 8, ¶ 17]. Dr. Milsten specializes in prostate cancer care. [*Id.*]. Dr. Milsten and Mr. Teel discussed Mr. Teel's treatment options, including surveillance, radiation therapy, and surgical intervention. [*Id.*]. Mr. Teel ultimately elected to have surgery despite the known possible side effects, including urinary incontinence and erectile dysfunction. [Doc. 44, p. 11, ¶ 18; Doc. 49, p. 8, ¶ 18]. On December 19, 2016, Dr. Milsten successfully removed Mr. Teel's prostate and tumor contained therein. [Doc. 44, p. 12, ¶ 20; Doc. 49, p. 8, ¶ 20]. The prostate cancer was moderate volume, had a Gleason Score of 7, and involved

---

[1] The Gleason Scale is a standard rating system used to rate the aggressiveness of prostate cancer. [Doc. 44, p. 5, ¶ 2; Doc. 49, p. 5, ¶ 2].

ten percent of the prostate on the left side.  [*Id.*].  No cancer was detected on the right side of Mr. Teel's prostate and it had not metastasized.  [*Id.*].

Dr. Milsten provided post-operative care to Mr. Teel.  [Doc. 44, p. 12, ¶ 21; Doc. 49, p. 8, ¶ 21].  Mr. Teel has suffered urinary incontinence and erectile dysfunction as a result of the surgery, but, to date, Mr. Teel has no evidence of recurrence of the cancer.  [Doc. 44, p. 12, ¶¶ 20-21; Doc. 49, p. 8, ¶¶ 20-21].

## III.   Defendant's Motion to Exclude

In applying Rule 702, trial courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993).  As part of its inquiry, a trial court must assess whether a witness is qualified "by knowledge, skill, experience, training, or education" to offer expert testimony.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (citation omitted).  If that requirement is met, expert testimony is admissible if it bears the hallmarks of reliability—it is "based on sufficient facts or data," it is "the product of reliable principles and methods," and "the expert has reliably applied [those] principles and methods."  Fed. R. Evid. 702.  The defendant concedes Dr. Milsten is qualified to offer expert testimony.  [Doc. 42, p. 2].  The defendant argues his opinions are nonetheless inadmissible because they are not sufficiently reliable.  [*Id.*].

"To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not mere 'subjective belief or unsupported speculation.'"  *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590).  In other words, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate validation—*i.e.* 'good grounds,' based on what is known." *Daubert*,

509 U.S. at 590. "While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.'" *Goebel*, 346 F.3d at 991 (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995)). "The plaintiff need not prove that the expert is indisputably correct or that the expert's theory is generally accepted in the scientific community." *Id.* (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir.1999)). "Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Id.*

The Supreme Court has identified four non-exclusive factors of reliability: (1) whether the expert's theory can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has general acceptance. *Daubert*, 509 U.S. at 593-94. The inquiry into these factors is "a flexible one," and the focus is "on principles and methodologies, not on the conclusions they generate." *Id.* at 594.

Defendant challenges two opinions offered by Dr. Milsten. The court considers each in turn.

*First*, defendant challenges Dr. Milsten's opinion that the testosterone treatment administered to Mr. Teel caused his prostate cancer to grow. "Dr. Milsten's opinions at issue, about testosterone and causation, are not based on good grounds. He provides no testing or studies that support his view. Furthermore, he does not even mention, let alone engage with, the research cited by Defendant's expert. Dr. Milsten does not support his opinions with anything beyond his own subjective views, without employing any scientific methodology." [Doc. 42, pp. 10-11 (internal citations omitted)]. Plaintiff disagrees, arguing Dr. Milsten bases his opinion on a

scientific study and laboratory observation.  [Doc. 48, pp. 2-3].  In addition, deposition excerpts

demonstrate Dr. Milsten also relied on extensive clinical experience:

> [W]hat we know from [Mr. Teel's] situation, what I know in comparison to a
> number of patients that I've taken care of in similar situations is that testosterone
> and prostate cancer are bad together . . . that's my clinical opinion as an expert in
> prostate cancer.  That's what I do.  And that's what I see.  And exposure of
> testosterone to his disease caused a rapid acceleration to the PSA and likely, the
> growth of it.
>
> . . .
>
> [B]ased on everything that I do, and follow the guidelines for, you know, I think
> that my experience of having done about 2,000 of these surgeries, and taken care
> of thousands of patients with prostate cancer amounts to some clinical volume of
> expertise.

[Doc. 48-1, p. 5].  In addition, he considered Mr. Teel's PSA scores: "[W]hat we know is [Mr.

Teel's] PSA changed dramatically.  We look at the velocity of PSA.  And the change of his PSA

over time was much greater than what we would anticipate for someone who had more indolent

moderate grade prostate cancer."  [Doc. 42-2, p. 37].

Dr. Milsten's opinion is sufficiently reliable.  First, the relationship between testosterone

and prostate cancer has and continues to be tested.  While the position that testosterone accelerates

the growth of prostate cancer cells in every case is the subject of debate [*see* Doc. 42-2, p. 14; Doc.

48-3], the government does not claim Dr. Milsten's view has been completely falsified.  The

government's expert, Dr. Little, acknowledged at his deposition that there is "no definitive answer

one way or the other."  [*See* Doc. 48-2, pp. 3-4].  Neither unanimity of scientific opinion nor

general acceptance is absolutely required for expert testimony to be admissible.  *See Daubert*, 509

U.S. at 588 ("[A] rigid general acceptance requirement would be at odds with the liberal thrust of

the Federal Rules and their general approach of relaxing the traditional barriers to opinion

testimony. (quotation marks omitted)).  Second, Dr. Milsten's view has been subject to peer review

and publication.  The primary study he relies on was published in 1941, but there is no evidence

the study has been disproved. Dr. Little—the government's expert—even classified the 1941 findings as "maybe one of the most important discoveries that anybody has ever made in the whole prostate cancer treatment field." [Doc. 48-2, p. 3]. In addition, plaintiff points to a 2016 peer-reviewed publication finding "[g]iven the driver role for androgen receptor (AR) in prostate cancer, we believe that testosterone replacement therapy (TRT) may promote [prostate cancer] progression and cannot be given without expressing this concern." [Doc. 48-3, p. 2]. While the study also presents the opposing view that there is no causal link between testosterone therapy and the growth of prostate cancer, the Federal Rules of Evidence do not require the expert be "undisputably correct." *Goebel*, 346 F.3d at 991. "Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Id*. Plaintiff has sufficiently done so here by showing Dr. Milsten's opinion is supported by published studies, laboratory observation, clinical experience, and analysis of Mr. Teel's PSA scores.

*Second*, defendant challenges Dr. Milsten's opinion on the causal link between Mr. Teel's alleged damages and the alleged delay in diagnosis. [Doc. 42, p. 1]. "Dr. Milsten has no basis to opine that if CIH had diagnosed Mr. Teel's cancer earlier, he would have avoided the damages he suffered. Thus, any alleged negligence by CIH did not cause Mr. Teel any damages. The harm he suffered was caused by cancer, not his care." [Doc. 42, p. 12]. However, Dr. Milsten testified that, based on Mr. Teel's PSA scores and "the natural history of prostate cancer," Mr. Teel's prostate cancer would have been detected as early as 2014. [Doc. 42-2, p. 33:22–34:5]. He testified that Mr. Teel "may have been a much better candidate for more conservative management or active surveillance at an earlier onset or detection of disease before it progressed." [*Id.*, p. 35]. This opinion is based on Dr. Milsten's extensive clinical experience, analysis of Mr. Teel's PSA

scores, and the biological understanding of prostate cancer. Accordingly, Dr. Milsten's opinion bears sufficient indicia of reliability.

In further support of this conclusion, the court notes that "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (citation omitted). For these reasons, defendant's Motion to Exclude Certain Testimony of Plaintiff's Expert [Doc. 42] is denied.

## IV. Defendant's Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for summary judgment, "[t]he evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party." *Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir. 2004). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Summary judgment is appropriate only "where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Stover,* 382 F.3d at 1070 (quoting Fed. R. Civ. P. 56(c)).

Defendant argues "[t]he undisputed facts of this case, taken in a light most favorable to Mr. Teel, establish[] that Defendant's care did not cause him any damages. Specifically, CIH's care did not cause Mr. Teel to have prostate cancer or affect the nature or severity of the side effects he

suffered." [Doc. 43, p. 1]. Because Mr. Teel cannot show an essential element of his claim, in defendant's view, "summary judgment must be entered against Mr. Teel as a matter of law." [*Id.*, p. 2]. Mr. Teel argues in response that there is a genuine issue of material fact precluding summary judgment, namely whether CIH providers exacerbated Mr. Teel's prostate cancer and deprived him of alternative treatment options by failing to timely refer him to a urologist and by administering testosterone injections.[2] [*See* Doc. 49, p. 1].

In FTCA suits, federal courts "look to state law to resolve questions of substantive liability." *Miller v. United States*, 463 F.3d 1122, 1123 (10th Cir. 2006). Under Oklahoma law, "a *prima facie* case of medical negligence has three elements: 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care." *Smith v. Hines*, 261 P.3d 1129, 1133 (Okla. 2011).

Here, the dispute centers on causation. [*See* Doc. 44, p. 15]. "Causation becomes a question of law **only** when there is no evidence and no reasonable inference from the evidence from which the jury could reasonably find a causal link between the negligent act and the injury." *Smith*, 261 P.3d at 1133 (emphasis added). "In medical negligence cases, a physician's negligence is ordinarily established by expert medical testimony." *Id.* Oklahoma case law does not require "production of experts who will utter a particular magic phrase." *Id.* (quoting *Robinson v. Oklahoma Nephrology Associates, Inc.*¸154 P.3d 1250, 1255 (Okla. 2007). "While the plaintiff

---

[2] Defendant also moved for summary judgment "on any alleged negligence based on CIH's discretionary functions or acts allegedly committed by contractors" because such acts "are not within the Court's jurisdiction." [Doc. 43, pp. 1-2]. Plaintiff conceded such claims are outside the scope of the FTCA and appears to clarify that the negligent acts alleged are limited to the delayed diagnosis and administration of testosterone replacement therapy and do not include funding decisions. [*See* Doc. 49, p. 17].

must present evidence to remove the cause of her injuries from the realm of guesswork, she need not establish causation to a specifically high level of probability merely to withstand a demurrer to the evidence . . . **Absolute certainty is not required**." *Id.* (emphasis original).

Plaintiff's expert, Dr. Milsten, testified that testosterone therapy accelerates the growth of cancer cells, the progression of prostate cancer, and the potential for metastasis. [Doc. 44-2, pp. 14-15]. His opinion is supported by published studies, laboratory observation, clinical experience, and analysis of Mr. Teel's PSA scores. Dr. Milsten also testified that Mr. Teel's prostate cancer could have been detected as early as 2014. [Doc. 42-2, pp. 34-35]. Further, he testified that earlier detection may have made Mr. Teel a "better candidate for more conservative" treatment. [Doc. 42, p. 36]. This opinion appears to be based on Dr. Milsten's extensive clinical experience, analysis of Mr. Teel's PSA scores, and generally accepted views about the progression of prostate cancer. While the defendant intends to submit expert testimony to the contrary, Oklahoma courts "are committed to the rule that opinion evidence, such as that given by the plaintiff's expert witness[], that a certain cause might, could, or possibly did or would bring about a certain result is competent and may have some probative value." *Smith*, 261 P.3d at 1135 (quoting *Oklahoma Natural Gas Co. v. Kelly*, 153 P.2d 1010, 1012 (Okla. 1944)). The Oklahoma Supreme Court has emphasized that where there is a disagreement between experts on causation, "it [is] for the jury to resolve the conflict and to give such weight to the testimony of each of the expert witnesses as it deemed proper." *Id.*

Here, genuine issues of material facts exist. Such issues include, but are not limited to, whether the administration of testosterone accelerated the growth and development of Mr. Teel's prostate cancer and whether any delay in diagnosis caused Mr. Teel greater injury than he otherwise would have incurred. Dr. Milsten is prepared to testify that "treating Mr. Teel with

testosterone accelerated the development and growth of prostate cancer. His PSA history certainly supports this contention. Given the lapses in his care at the [CIH], there was substantial delay in the eventual diagnosis and treatment of his disease, which necessitated radical surgical intervention, resulting in unnecessary risk and morbidity." [Doc. 44-31, p. 4]. Further, the undisputed facts support an inference of causation. It is undisputed that Mr. Teel's PSA scores increased dramatically while he received testosterone injections. In addition, it is reasonable to infer that detection of Mr. Teel's prostate cancer in 2014 would have increased his treatment options. *See* Smith, 261 P.3d at 1135 (noting reasonable inference of causation from facts in addition to expert testimony defeating summary judgment). It cannot be said there is "a complete lack of evidence and no reasonable inference tending to link the defendant's negligence to the plaintiff's harm." *See id.* A reasonable fact-finder could conclude that Mr. Teel's injuries were caused by CIH's delay and administration of testosterone replacement therapy. Accordingly, defendant's Motion for Summary Judgment [Doc. 43] is denied.

## V. Loss of Chance

As a final note, it appears the parties disagree about the nature of injury alleged and the potential application of some form of the "loss of chance" doctrine.[3] The defendant characterizes Mr. Teel's injury as the side effects of prostate removal. [Doc. 50, p. 9]. Thus, in its view, there is no but-for causation if earlier detection would have nonetheless resulted in prostate removal and accompanying side effects. [Doc. 50, p. 2]. However, plaintiff argues he suffered injuries in the form of "increased PSA levels; progression of prostate cancer; loss of chance of alternative

---

[3] "Loss of chance applies when a plaintiff might have suffered the injury without the defendant's negligent act because he was already prone to an injury or was already seriously ill, but the defendant's negligence increased the probability of the injury. In such situations, the defendant's conduct has often complicated the plaintiff's efforts to prove causation." *Robinson*, 154 P. 3d at 1254 n. 1 (citing *McKellips v. St. Francis Hosp., Inc.* 741 P.2d 467, 471-72 (Okla. 1987)).

treatments; and mental pain and suffering." [Doc. 49, p. 4]. As to his loss of chance of alternative treatments argument, plaintiff cites in support "loss of chance" principles regarding uncertain causation in medical malpractice cases. [*See* Doc. 49, pp. 16-17 ("Under Oklahoma law, the Defendant cannot now be allowed to come in after the fact and allege that the result was inevitable inasmuch as the Defendant's doctors put Mr. Teel's chance beyond the possibility of realization.").

Plaintiff is correct that the Oklahoma Supreme Court has found "loss of chance" principles instructive even where plaintiffs do not plead the theory. In *Robinson v. Oklahoma Nephrology Assoc., Inc.*, 154 P.3d 1250 (Okla. 2007), the Supreme Court of Oklahoma found "loss of chance" principles instructive because "its foundation is the special relationship of the physician and patient." *Id.* at 1255 (citation and internal quotation marks omitted). "For example," the Oklahoma Supreme Court noted, "we generally accept the principle that health care providers should not be given the benefit of the uncertainty created by their own negligent conduct." *Id.* (citation and internal alterations omitted). Accordingly, plaintiff's citations to the general principle regarding uncertainty caused by providers' negligence are appropriate and plaintiff, as noted above, has presented sufficient evidence to defeat defendant's motion for summary judgment.[4]

## VI. Conclusion

WHEREFORE, defendant's Motion to Exclude Certain Testimony of Plaintiff's Expert [Doc. 42] and Motion for Summary Judgment [Doc. 43] are DENIED.

IT IS SO ORDERED this 7th day of January, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[4] However, plaintiff did not plead "loss of chance" and cannot benefit from the associated relaxed causation requirement. Plaintiff must produce evidence of causation sufficient to meet the traditional rule. *See McKellips,* 741 P.2d at 475 ("We note that our decision today does not change the traditional principles of causation in the ordinary negligence case and this new rule applies only in those limited situations as presented here.").